IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RYAN FENSTERMAKER, | ) | CASE NO. 1:17-cv-01272 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Ryan Fenstermaker ("Plaintiff" or "Fenstermaker") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2.

For the reasons discussed herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

Fenstermaker protectively filed[1] an application for DIB on April 3, 2014, alleging a disability onset date of April 1, 2013.  Tr. 33, 167-168, 179.  He alleged disability due to back issues, mental health, blood pressure, anxiety, mood disorder, kidney cancer surgery with kidney

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 5/21/2018).

issues, hernias from surgery, right-side scar tissue, loss of memory, and sleep disorder – onset insomnia.  Tr. 88, 100, 116, 124, 182.   After initial denial by the state agency (Tr. 116-119) and denial upon reconsideration (Tr. 124-130), Fenstermaker requested a hearing (Tr. 132-133).  A hearing was held before Administrative Law Judge Irma Flottman ("ALJ") on July 19, 2016.  Tr. 50-86.

In her October 17, 2016, decision (Tr. 30-49), the ALJ determined that Fenstermaker had not been under a disability from April 1, 2013, through June 30, 2016, the date last insured (Tr. 33, 44).  Fenstermaker requested review of the ALJ's decision by the Appeals Council.  Tr. 25-27.  On April 17, 2017, the Appeals Council denied Fenstermaker's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Fenstermaker was born in 1976.  Tr. 167, 179.  Fenstermaker was 39 years old at the time of the hearing.  Tr. 54.  Fenstermaker had custody of three of his daughters until more recently.  Tr. 54.  At the time of the hearing, his two oldest daughters were living with their mother and his youngest daughter was going to be returning to live with him.  Tr. 54-55.  Fenstermaker also has two sons from a different marriage and a daughter from another relationship.  Tr. 451.

Fenstermaker served in the United States Marine Corps and has a college degree in Homeland Security and Counter Terrorism.  Tr. 53, 55, 81-82.   Fenstermaker stopped serving in the Marine Corp in 2004.  Tr. 55.  When he came out of the Marine Corp his rank was Sergeant.  Tr. 55, 81-82.  Fenstermaker receives disability benefits through the Veterans Administration ("VA").  Tr. 55-56.

When Fenstermaker first got out of the Marine Corp, he worked as a sheriff's deputy for about a year and a half.  Tr. 57-58.  Following that job, in 2006 and 2007, Fenstermaker performed work on an overseas contract doing personal security detail.  Tr. 58.  Fenstermaker also worked in 2007 at the Department of Corrections in the State of South Carolina.  Tr. 58-59.  He was only at that position for about 3 months.  Tr. 59.  He stopped working at that job because he moved once he obtained custody of his daughters.  Tr. 59.  Fenstermaker last worked in April 2013.  Tr. 56.  He worked as an archery technician and sales person in a sporting goods store.  Tr. 56-57.  He stopped working because he was having difficulties completing the work and he was having a difficult time handling things mentally.  Tr. 56.  He had an argument with one of the owner's sisters and he ended up walking out.  Tr. 56.  Fenstermaker had obtained a vendor's license prior to leaving his job at the sporting goods store with the intent to start his own business but, after he left the sporting goods store job, things started to go downhill with his medical issues and his marriage and he did not want to do anything.  Tr. 77-78.

**B.     Medical evidence**

**1.  Treatment history**

Fenstermaker has received medical treatment through the VA.  Tr. 56.  In early January 2013, Fenstermaker requested a referral to orthopedics for his chronic low back pain and complained of right elbow pain.  Tr. 428.

On January 25, 2013, Fenstermaker saw Karla Naumoff, LISW-S, for an individual psychotherapy session (Tr. 421-422) and Shane Strnad, a nurse practitioner, for medication management (Tr. 423-425).  Fenstermaker complained of lack of sleep, irritability, and anxiety.  Tr. 421.  Fenstermaker reported having conflicts at work.  Tr. 421.  Problem solving techniques were discussed as a means to assist Fenstermaker with managing his anger or frustrations.  Tr.

421-422.  On mental status examination, Fenstermaker was polite and cooperative; psychomotor

activity was normal; and his speech was non-pressured and fluent.  Tr. 422.  His affect was

blunted but appropriate.  Tr. 422.  Fenstermaker's mood was worried and frustrated but there

were no feelings of hopelessness, helplessness or worthlessness nor any suicidal or homicidal

thoughts.  Tr. 422.  His judgment was fair and his insight was good.  Tr. 422.

During his session with Nurse Strnad, Fenstermaker complained of being "short fused,

[having] limited sleep but plenty of energy[]" but reported that those symptoms had lessened

with fluoxetine.  Tr. 424.  Fenstermaker was working about 50 hours per week.  Tr. 424.  He was

frustrated with his back pain and he was experiencing stress at work and at home.  Tr. 424.  On

mental status examination, Nurse Strnad observed that Fenstermaker was friendly and

cooperative; his psychomotor activity was normal; his speech was non-pressured and fluent; his

mood was euthymic; his affect was full, appropriate; there was no hopelessness, helplessness or

worthlessness noted; no suicidal or homicidal thoughts were elicited; reality testing appeared

normal; and his insight and judgment were fair.  Tr. 424.  Nurse Strnad diagnosed insomnia;

mood disorder, NOS; and rule out bipolar disorder.  Tr. 425.  Nurse Strnad increased

Fenstermaker's fluoxetine because it had been effective.  Tr. 424-425.

On February 12, 2013, Fenstermaker saw neurologist Brian Koo, M.D., for evaluation of

his poor sleep.  Tr. 419-420.  Dr. Koo assessed mild to moderate obstructive sleep apnea, noting

that Fenstermaker was not using a CPAP; and depression and pain related to insomnia.  Tr. 420.

Fenstermaker indicated that he did not feel that the fluoxetine was working.  Tr. 420.  Dr. Koo

suggested talking to his psychiatrist about switching to a sedating anti-depressant, like

mirtazapine.  Tr. 420.  When Fenstermaker saw Nurse Strnad on February 15, 2013, (Tr. 416-

418), Fenstermaker indicated that fluoxetine had been helpful in the past but his low mood and

4

irritability were continuing notwithstanding increases in the dosage (Tr. 417).  He was planning a trip to Alabama for an archery competition.  Tr. 417.  Fenstermaker was seeing pain management for his back.  Tr. 417.  His mood was not good when he was not with his family.  Tr. 417.  Nurse Strnad discontinued the fluoxetine and started Fenstermaker on mirtazapine.  Tr. 418. Fenstermaker also saw Ms. Naumoff on February 15, 2013, and reported continued difficulty sleeping and feeling anxious but he was taking his medication as prescribed.  Tr. 414.

Fenstermaker saw Nurse Strnad again on April 2, 2013.  Tr. 411-413.  Fenstermaker reported that the mirtazapine was not helping with his sleep or mood.  Tr. 412.  Fenstermaker relayed that he had quit work over the weekend following a dispute with the owner's sister.  Tr. 412.  Fenstermaker planned to start his own business selling archery equipment.  Tr. 412.  He already had a vendor's license and planned to work out of his garage.  Tr. 412.  On mental status examination, Nurse Strnad observed Fenstermaker's eye contact was good; his demeanor was friendly and cooperative; his psychomotor activity was normal; his speech was non-pressured and fluent, logical, goal-oriented; his mood was mildly dysthymic to euthymic; his affect was full and appropriate; and his insight and judgment were fair.  Tr. 412.  Nurse Strnad discontinued mirtazapine and started Fenstermaker on amitriptyline.  Tr. 413.

On April 9, 2013, Fenstermaker saw Laura Britt, a nurse practitioner, for follow up regarding his hypertension.  Tr. 406-409.  Fenstermaker had run of out his medication.  Tr. 408. His elbow pain resolved if he exercised and lifted weights with his upper body.  Tr. 408.  His low back pain remained unchanged.  Tr. 408.  He was seeing a doctor for his pain.  Tr. 408. Fenstermaker's hypertension medication was renewed and the nurse advised Fenstermaker that running out of his medication presented health concerns.  Tr. 408.

Fenstermaker continued to see various medical providers for evaluation and treatment of his sleep issues, anxiety and mood disorder in April 2013.  Tr. 388-402.  On April 16, 2013, Dr. Koo indicated that Fenstermaker's case was a complicated case of sleep onset insomnia.  Tr. 402. Because of other medication Fenstermaker was already taking, Dr. Koo recommended holding off on introducing a new medication.  Tr. 402.  He suggested further psychiatric assessment for PTSD.  Tr. 402.  On April 17, 2013, Nurse Strnad noted that Fenstermaker had been evaluated for PTSD on April 9, 2013, and the screening was negative.  Tr. 402.  Nurse Strnad indicated that Fenstermaker's previously reported symptoms were consistent with non-specific mood disorder, possibly related to ongoing physical problems, including back pain and insomnia.  Tr. 402.  During an April 30, 2013, session with Nurse Strnad, Fenstermaker reported he was working for himself and contemplating a possible move to southern Ohio because his wife had an opportunity in that area and he thought selling archery in that area might be more profitable. Tr. 390.  Fenstermaker's mood was mildly dysthymic to euthymic.  Tr. 390.  Otherwise, his mental status examination was generally normal.  Tr. 390.  He was continuing to have problems with sleep and he was irritable.  Tr. 390.  Fenstermaker felt that the amitriptyline was not helping with his sleep or mood and he had gained weight.  Tr. 390.  Nurse Strnad switched Fenstermaker's medication from amitriptyline to hydroxyzine.  Tr. 391.

On May 1, 2013, Fenstermaker underwent a VA Compensation and Pension Examination, which was conducted by psychologist Sara Walters-Bugbee.  Tr. 378-387. Fenstermaker reported "extreme frustration intolerance" and increased problems with his own emotional distress which had affected his familial relationships.  Tr. 382.  He discussed common anxiety symptoms such as being in a room full of people or in closed spaces.  Tr. 383-384.  He reported becoming angry more frequently.  Tr. 384.  He had been able to maintain relationships

with two friends over the years.  Tr. 382.  Fenstermaker denied medication management for his

back pain and indicated he felt that pain management was a waste of time.  Tr. 384.  Ms.

Walters-Bugbee observed that Fenstermaker was generally cooperative but he was very agitated

and expressed frustration and guardedness during the examination.  Tr. 385.  In summary, Ms.

Walters-Bugbee stated:

> Since last exam, evidence review shows Veteran has regularly participated in MH
> and pain management services without much success.  His mood symptoms appear
> slightly worse and are somewhat more socially and occupationally impairing based
> on his inability to effectively manage them, since last exam.  Veteran will likely
> continue to require targeted and structured individual cognitive-behavioral therapy
> to address problems with pain management and resulting anger, depression, and
> generalized worry that are a direct consequence of a chronic medical condition.
> However, presence of characteristics such as extreme defensiveness and low-
> threshold for frustration will likely continue to impede therapeutic progress.

Tr. 387.

During a May 6, 2013, follow up session with Ms. Naumoff, Fenstermaker reported

continued concerns regarding lack of sleep, irritability and his physical health, noting he had

gained 15 pounds over the prior month.  Tr. 374.  Fenstermaker reported being relieved that he

was finished with college and would have more time to focus on his business.  Tr. 374.  Ms.

Naumoff observed that Fenstermaker was polite and cooperative; his affect was blunted,

appropriate; his mood was worried, angry and frustrated; his judgment was fair; and his insight

was good.  Tr. 375.  During a May 14, 2013, session with Nurse Strnad, Fenstermaker relayed

that they were not going to be moving.  Tr. 372.  Fenstermaker did have some upcoming archery

shows that he was planning on attending and competing in which would provide him and

opportunity to network and sell his product.  Tr. 372.  He still complained of being "short fused"

and having "limited sleep but plenty of energy."  Tr. 372.  Nurse Strnad made some adjustments

to Fenstermaker's medication.  Tr. 372-373.

Fenstermaker continued to treat with Ms. Naumoff, Nurse Strnad, and Nurse Britt throughout 2013, with continued complaints of irritability, frustration, mood swings, anger and poor sleep. Tr. 293-370.  Adjustments were made to Fenstermaker's medications during this period.  300, 310-311, 326, 338.  He had some normal mental status examination findings but also was observed to have a blunted affect, irritable mood, and to be frustrated and anxious.  Tr. 293-370.  In June 2013, Fenstermaker described an incident when he became very angry at a driver who almost hit him.  Tr. 353.  Fenstermaker followed the individual down route 71.  Tr. 353.  He indicated he would not have reacted in this manner if his family had been with him.  Tr. 353.  He indicated it was difficult at times to identify a trigger for his anger.  Tr. 353.  In July 2013, Fenstermaker relayed that he had undergone a sleep study and was waiting on the results. Tr. 343.  He indicated he was planning on continuing to attend bow shooting tournaments, indicating that he felt it was a good outlet for him.  Tr. 343, 346.  On August 7, 2013, Fenstermaker discussed his upcoming marriage.  Tr. 333.  He also reported being happy about having recently purchased a motorcycle and he relayed that he enjoyed spending time with his daughters and cooking.  Tr. 333.  Also, on August 7, 2013, Fenstermaker relayed he had had a job interview but "snapped," stating that they had lied to him about the position.  Tr. 338. Fenstermaker was continuing to work his own business and it was okay because he was not around others when working on archery equipment.  Tr. 338.  In August and September Fenstermaker relayed that he had participated in a Wounded Warrior fundraising project.  Tr. 313, 316, 322.  The project was helping him keep his mind occupied.  Tr. 322.  During an August 26, 2013, session, Fenstermaker reported being very upset over a situation with his youngest son and having issues with his ex-wife.  Tr. 322, 326.  During a September 6, 2013, session, Fenstermaker acknowledged that he wanted to continue to establish relationships with

his sons.  Tr. 316.  He reported enjoyment with focusing on the hunting season and working on

the Wounded Warrior project.  Tr. 316.  In October 2013, Fenstermaker relayed that he had

recently gotten married.  Tr. 306.  He relayed that he was starting to feel more detached from

others and losing interest in activities he once found enjoyable such as bow hunting.  Tr. 306.  In

November 2013, Fenstermaker reported being irritable due to situations with his sons and his ex-

wife.  Tr. 299, 301.  Fenstermaker continued to decline Ms. Naumoff's suggestion for a referral

to a Men's Depression Group.  Tr. 301.  In November 2013, Fenstermaker also saw Nurse Britt

for follow up regarding his obesity.  Tr. 394.  She observed that his weight had not changed

significantly.  Tr. 394.  He was not exercising a lot.  Tr. 294.  He was "hunting – not sitting a lot

[with] that."  Tr. 294.  He declined a nutrition consultation.  Tr. 294.  Fenstermaker complained

of shortness of breath, which Nurse Britt felt was noncardiac in nature.  Tr. 295.  Fenstermaker

declined an inhaler.  Tr. 295.

On March 7, 2014, Fenstermaker had another VA Compensation and Pension

Examination, which was conducted by psychologist Gina Dillon.  Tr. 284-290.  Fenstermaker

reported that his constant back pain increased his level of irritability and decreased his tolerance

to manage conflict and stress.  Tr. 287.  He described himself as being "extremely

confrontational" and his wife described him as a "loose cannon."  Tr. 288.  Fenstermaker was not

doing well when out in public and he was not leaving his house as often as he had.  Tr. 288.  In

her summary, Ms. Dillon stated:

> Despite mood symptoms, veteran would likely be able to carry out employment
> that does not involve frequent interaction with others. While he ultimately walked
> out of his job based on ongoing conflicts that are deemed as tied to chronic pain
> issues, he was able to maintain work at this sporting goods store for 2 1/2 years
> despite the above issues. He also graduated from college with a four-year degree
> last May.  Both of these points indicate that he is capable of maintaining enough
> stability and focus to be successful in an occupational capacity of some kind,
> though would likely require accom[mo]dations for chronic back pain issues.

Tr. 290.

Fenstermaker saw both Ms. Naumoff and Nurse Strnad in April 2014.  Tr. 264-269, 276-282.  On April 9, 2014, Nurse Strnad noted that sertraline may be helping Fenstermaker more than Fenstermaker realized.  Tr. 277.  Nurse Strnad continued Fenstermaker on sertraline and added bupropion to augment.  Tr. 277.  On April 17, 2014, Fenstermaker reported feeling "sluggish and zombie-like" since starting the bupropion but he indicated that he felt that it was helping his mood and helping to keep him from exploding.  Tr. 268.  Per Nurse Stand's recommendation, Fenstermaker was advised to continue taking the medication but to take one tablet at bedtime.  Tr. 269.  On April 23, 2014, Fenstermaker informed Ms. Naumoff that he did feel that his medication was helping his mood and thought he might need an increase.  Tr. 258-260.  Also in April 2014, Fenstermaker saw Katharine Harpley, a physician assistant, for a pain consultation.  Tr. 477-478.  Fenstermaker reported that injections, therapy, and chiropractic treatment had not helped in the past and he had stopped his medications because he could not function.  Tr. 477.  He indicated he was not working and spent his days going for a walk, biking or fishing.  Tr. 477.  A lumbar MRI showed mild to moderate spondylosis at L3-4, L4-5.  Tr. 477.  Ms. Harpley referred Fenstermaker for a TENS unit and she recommended life style changes such as daily strengthening and conditioning exercises and stretches.  Tr. 478. Fenstermaker was not interested in additional injections or medication.  Tr. 478.

In May 2014, upon his primary care physician's referral, Fenstermaker saw Rachel Springer, a clinical pharmacist, regarding his hypertension.  Tr. 469-471.  Ms. Springer noted that at his prior primary care appointment it was noted he had not been taking his blood pressure medication.  Tr. 470.  He denied shortness of breath but noted that he occasionally felt his heart rate increase and occasionally felt chest pain.  Tr. 470.  Ms. Springer recommended that

Fenstermaker continue with medication and she encouraged a low salt diet and a decrease in caffeine.  Tr. 470.

A May 9, 2014, lumbar MRI revealed mild degenerative changes at the facet joints at L3-L4, L4-L5 level and mild right neural foramen compromise from bulging disc at L4-L5 level. Tr. 539-540.  A CT scan of the kidneys showed no CT evidence of local recurrence or intra-abdominal metastatic disease, a fatty liver, and a stable 3 mm focal hypodense focus in the pancreatic tail.  Tr. 537-538.

During a May 22, 2014, session with Ms. Naumoff, Fenstermaker expressed continued concern about lack of sleep, irritability, physical health, lack of motivation, depression, memory, and concentration but he did feel that his medication was continuing to help with his mood.  Tr. 463.  Fenstermaker indicated he had been able to fish but he was only leaving his house for appointments.  Tr. 463.

During a June 9, 2014, telephone call with a nurse regarding a refill of his bupropion, Fenstermaker relayed that he was interested in speaking with his primary care RN regarding bouts of dizziness he was having when rising from a squatting to standing position.  Tr. 462. Fenstermaker was scheduled for a nursing orthostatic blood pressure check.  Tr. 461.

On June 11, 2014, Fenstermaker saw Ms. Naumoff.  Tr. 457-458.  He reported he had run out of medication and planned to talk to Nurse Strnad about it.  Tr. 458.  Because he ran out of medication, Fenstermaker had started drinking alcohol to help him relax.  Tr. 458.  Fenstermaker was cooperative and polite; his psychomotor activity was normal; his speech was non-pressured and fluent; his affect was blunted, appropriate; his mood was frustrated and angry; no hopelessness or helplessness was noted; his judgment and insight were fair; and his support was adequate.  Tr. 459.  On the same day, Fenstermaker saw Nurse Strnad.  Tr. 455-456.

11

Fenstermaker still owned his archery business but was not doing much with it.  Tr. 456.

Fenstermaker reported increased stress because he was out of medication and he reported

drinking more.  Tr. 456.  Fenstermaker reported some improvement with bupropion and

sertraline.  Tr. 456.  Nurse Strnad continued Fenstermaker on those medications.  Tr. 457.

       On July 1, 2014, Fenstermaker started seeing a new provider, psychiatrist Govindaraja

Sampath, for medication management.  Tr. 450-452.  Dr. Sampath diagnosed mood disorder,

NOS; adjustment disorder, NOS; and alcohol abuse in early remission.  Tr. 452.  Dr. Sampath

observed that Fenstermaker's mental status was essentially in normal limits except for his

subjective complaints of irritability, frustration and general feelings of unhappiness.  Tr. 452.

Dr. Sampath adjusted Fenstermaker's sertraline dose, continued him on bupropion, and added

zolpidem for sleep.  Tr. 452.  On July 2, 2014, Fenstermaker spoke with Ms. Naumoff regarding

an incident that had occurred the prior evening.  Tr. 449-450.  Fenstermaker reported getting into

an altercation with an adult male because the other individual did not stop the behaviors that

Fenstermaker felt were projected at him.  Tr. 450.  Fenstermaker tried to choke the individual.

Tr. 450.  Fenstermaker denied any current suicidal, violent, or homicidal thoughts or plans.  Tr.

450.

       During a July 8, 2014, visit with Nurse Britt for follow up regarding his orthostatic

hypotension, Fenstermaker reported that his dizziness had improved.  Tr. 446.  He still had some

dizziness when rising too quickly.  Tr. 446.  Fenstermaker had lost some weight; he was trying to

eat healthy and exercise.  Tr. 446.  Fenstermaker denied that the weight loss resulted in any

improvement with his back pain.  Tr. 447.  Fenstermaker was not interested in treatment through

the pain clinic.  Tr. 447.  He was not leaving his house very often and planned to follow up with

Dr. Sampath.  Tr. 447.

During a July 11, 2014, visit with Ms. Naumoff, Fenstermaker reported that he felt that his medication was helpful at times.  Tr. 441.  Fenstermaker had gone fishing with friends but fished alone.  Tr. 411.  He relayed he did not want to go out in public.  Tr. 441.  Fenstermaker's mental status examination was similar to past examinations.  Tr. 442.  During a July 18, 2014, session with Dr. Sampath, a diagnosis of personality disorder, NOS, was added.  Tr. 439.  To address Fenstermaker's aggression, Dr. Sampath added topiramate.  Tr. 439.

During August 2014 sessions with Ms. Naumoff, Fenstermaker relayed marital problems but he was continuing to care for his daughters.  Tr. 431, 434.  He felt that his medication was helpful.  Tr. 431, 433.  At the end of August, Fenstermaker shared with Ms. Naumoff that he was planning to meet with his wife and did not want a divorce.  Tr. 652.  He had received some positive financial news concerning his dependents.  Tr. 652.  Fenstermaker had been able to leave his house and spend time with others and he had reduced his alcohol use.  Tr. 652.  Ms. Naumoff observed that Fenstermaker's mood was less frustrated and less angry.  Tr. 654.

On September 12, 2014, Fenstermaker saw Ms. Naumoff and relayed that his marriage was ending.  Tr. 643.  However, he did report that he was feeling less depressed and agitated that day.  Tr. 643.  He wanted to stay focused on caring for his daughters. Tr. 643.  Fenstermaker had not been drinking alcohol and he had been able to exercise.  Tr. 643.  On September 29, 2014, Fenstermaker saw Dr. Sampath and discussed his marital problems.  Tr. 789.  Dr. Sampath observed that Fenstermaker's mental status was essentially within normal limits except for his subjective complaints of irritability, frustration and general feelings of unhappiness.  Tr. 789.  Dr. Sampath recommended that Fenstermaker increase the topiramate in stages and continue with the sertraline and bupropion.  Tr. 789.

Fenstermaker continued to see Ms. Naumoff in November and December 2014 with complaints of lack of sleep, irritability, concerns about his physical health and financial concerns.  Tr. 748-750, 771-779.  During December visits, Fenstermaker indicated he was continuing to take his medication but he expressed some concerns.  Tr. 748, 771, 757.

On December 4, 2014, Fenstermaker was seen at the emergency room for chest pain.  Tr. 689, 692.  An EKG was negative for acute ischemic changes and a chest x-ray showed cardiomegaly and no acute cardiopulmonary disease.  Tr. 693, 710.  He was diagnosed with atypical chest pain; accelerated hypertension; anxiety, stable; obesity; and tobacco abuse.  Tr. 693-694, 714.  He was discharged on December 5, 2014.  Tr. 714, 715.  Fenstermaker returned to the emergency room on December 6, 2014, with complaints of shortness of breath.  Tr. 715.  Dr. Ajay Chawla, M.D., who treated Fenstermaker noted that a CT of the chest showed a 3 mm nodule in the lung and Fenstermaker could benefit from having it evaluated.  Tr. 715.  Dr. Chawla indicated that Fenstermaker's pain was likely caused by underlying acute exacerbation of chronic bronchitis.  Tr. 718.  During a December 7, 2014, follow-up visit with Dr. Chawla, Fenstermaker was doing well and his breathing was better.  Tr. 720.

On December 18, 2014, Fenstermaker saw Dr. Saksham Sulove, M.D, at Samaritan Professional Corporation, Mid-Ohio Internal Medicine to establish as a new patient relationship relative to his recent diagnosis of COPD and nodules on his lungs.  Tr. 743.  Fenstermaker was treating with inhalers.  Tr. 743.  He reported that he continued to feel short of breath on exertion and chest pain without radiation.  Tr. 743.  Dr. Sulove made various recommendations, including weight loss, regular daily exercise, a cardiac stress test, and a formal spirometric analysis.  Tr. 746.

Upon Dr. Sulove's referral, on February 12, 2012, Fenstermaker saw Dr. James Powell, M.D., for a pulmonary consultation.  Tr. 798-804.  Dr. Powell did not feel that Fenstermaker had asthma or COPD.  Tr. 803.  He noted that Fenstermaker had sinus drainage and a prior diagnosis of sleep apnea had been suspected.  Tr. 803.  Dr. Powell recommended a CT chest scan for the lung nodule, pulmonary function testing, referral to a sleep clinic, and a possible ENT referral for sinus symptoms and possible cardiology consultation.  Tr. 803-804.  A pulmonary function test was performed on February 17, 2015.  Tr. 791-792.  The results were consistent with eosinophilic airway inflammation and moderate partially reversible airflow obstruction with questionable trapping but no hyperinflation and normal gas diffusion.  Tr. 791.  During a follow-up visit with Dr. Powell on March 13, 2015, Dr. Powell noted that he could not understand why Fenstermaker had not resumed his Advair or Spiriva treatments following his pulmonary function testing.  Tr. 805.  Dr. Powell provided Fenstermaker with prescriptions for medications, including Singulair, Advair, Spiriva, and albuterol.  Tr. 810.

In May 2015, Fenstermaker saw Dr. Powell for follow up regarding his CT scans.  Tr. 812.  Dr. Powell noted that a recent CT scan of the nodule was stable, suggesting that the nodule was benign.  Tr. 812.  Dr. Powell noted that Fenstermaker had recently broken his foot and had recovered well.  Tr. 812.  Dr. Powell recommended that Fenstermaker continue on his course of medication for treatment of his pulmonary condition.  Tr. 819.

When Fenstermaker saw Dr. Sampath on August 18, 2015, he reported that the topiramate helped calm him down.  Tr. 842.  He did report feeling anger, tension and resentment when he thinks about his time in the military and how he was treated as if his life did not matter.  Tr. 842.  He indicated he was a little more depressed than he had been.  Tr. 842.  Dr. Sampath continued to observe that Fenstermaker's mental status was essentially within normal limits with

the exception of his subjective complaints of irritability, frustration and general feeling of unhappiness.  Tr. 842.  Dr. Sampath increased Fenstermaker's sertraline and continued his other medications.  Tr. 843.  The following month, Fenstermaker saw Dr. Sampath and reported increased irritability and an inability to control his tendency to be irritable and bad temper.  Tr. 845.  Dr. Sampath added Chlorpromazine to see if it would help with his anger control.  Tr. 845.  Fenstermaker also saw Ms. Naumoff in September 2015.  Tr. 846-848.  He relayed that he was continuing to have problems with managing current stressors of health concerns; he was feeling anxious and worried; he continued to have a low energy level; and his irritability had increased.  Tr. 847.  He was continuing to visit with his grandmother and care for his daughters.  Tr. 847.  Fenstermaker also saw Nurse Britt in September 2015 with reports of shortness of breath and high blood pressure.  Tr. 851.

On October 5, 2015, Fenstermaker saw Dr. Sampath and continued to report increased irritability and inability to control his bad temper.  Tr. 856.  Fenstermaker did report that his medication was helping him sleep well.  Tr. 856.  Fenstermaker also saw Ms. Naumoff on October 5, 2015, and continued to report difficulty coping with current stressors of health concerns, being around others for extended periods, lack of sleep and irritability.  Tr. 858.  He did feel though that his medication was helping him.  Tr. 858.

On December 28, 2015, another VA Compensation and Pension Examination was performed.  Tr. 862-874.  The examination was performed by psychologist James D. Mullen.  Tr. 874.  Fenstermaker relayed a loss of interest in all activities, including hunting and bow shooting, noting he had not engaged in those activities in two years.  Tr. 866.  He described his anger issues.  Tr. 866.  He indicated he did not do anything during the day because there was not a whole lot he could do.  Tr. 872.  Dr. Mullen concluded that Fenstermaker met the criteria for

16

having PTSD and persistent depressive disorder, indicating that those conditions were caused by or the result of events that occurred while he was serving in the military and they were severe and required continuous medication.  Tr. 873.

### 2.  Opinion evidence

#### a.       Physical impairments

*Treating physician*

On November 20, 2015, one of Fenstermaker's treating physicians V. Rajaram, M.D., completed a Medical Source Statement.  Tr. 821-826.  Dr. Rajaram opined that Fenstermaker could lift and/or carry no amount of weight; sit for 10 minutes at a time for a total of 2 hours in an 8-hour workday; stand for about 4 minutes at a time for a total of 1 hour in an 8-hour workday; and walk for 5 minutes at a time for a total of 1 hour in an 8-hour workday.  Tr. 821-822.  Dr. Rajaram opined that Fenstermaker had some limitations with reaching, handling and pushing/pulling and Fenstermaker could never operate foot controls with his right foot and could occasionally operate foot controls with his left foot.  Tr. 823.  Dr. Rajaram opined that Fenstermaker could never climb ladders or scaffolds, balance, stoop, kneel, crouch or crawl and he could only occasionally climb stairs and ramps.  Tr. 824.  As far as environmental limitations, Dr. Rajaram opined that Fenstermaker could never be around unprotected heights; moving mechanical parts; dust, odors, fumes and pulmonary irritants; extreme cold; extreme heat; or vibrations and Fenstermaker could only occasionally operate a motor vehicle or be exposed to humidity and wetness.  Tr. 825.  Also, Fenstermaker could only be around moderate levels of noise.  Tr. 825.

*Consultative examining physician*

On June 4, 2014, Sushil M. Sethi, MD, MPH, FACS, completed a consultative examination.  Tr. 590-597.  A lumbar x-ray was performed as part of the examination.  Tr. 597.  Dr. Sethi reported that the x-ray indicated transitional L5 vertebral body with pseudoarticulation to the sacrum, mild narrowing of L5-S1 that may be congenital, and slight levoconvex scoliosis of the lumbar spine.  Tr. 596.  Dr. Sethi's impression was history of low back pain; mild anxiety; and remote history of right nephrectomy for cancer 11 years prior with no recurrence.  Tr. 596.  Dr. Sethi opined that based on his objective findings, Fenstermaker's "ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying and handling objects may be slightly limited.  His hearing, speaking and traveling are normal."  Tr. 596.

*State agency reviewing physicians*

On May 6, 2014, state agency reviewing physician William Bolz, M.D., completed a Physical RFC Assessment.  Tr. 93-94.  Dr. Bolz opined that Fenstermaker could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and push and/or pull unlimitedly except as shown for lift and/or carry.  Tr. 93.  Dr. Bolz found no postural, manipulative, visual, communicative or environmental limitations.  Tr. 93-94.

Upon reconsideration, on September 22, 2014, state agency reviewing physician Leon D. Hughes, M.D., completed a Physical RFC Assessment.  Tr. 108-109.  Dr. Hughes opined that Fenstermaker could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and push and/or pull unlimitedly except as shown for lift and/or carry.  Tr. 108.  Dr. Hughes

18

opined that Fenstermaker had environmental limitations.  Tr. 108-109.  He would need to avoid all exposure to hazards (machinery, heights, etc.) – he could not perform work at unprotected heights or around dangerous machinery due to occasional dizziness/orthostatic hypotension.  Tr. 109.  Dr. Hughes found no postural, manipulative, visual, or communicative limitations.  Tr. 108-109.

### b.    Mental impairments

#### *State agency reviewing psychologists*

On May 6, 2014, state agency reviewing psychologist David Demuth, M.D., completed a Psychiatric Review Technique ("PRT").  Tr. 91-92.  In the PRT, Dr. Demuth opined that Fenstermaker had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration.  Tr. 92.

Dr. Demuth also completed a Mental RFC Assessment.  Tr. 94-96.  In the area of understanding and memory, Dr. Demuth opined that Fenstermaker was moderately limited in his ability to understand and remember detailed instructions but he retained the ability to perform 1-4 step tasks.  Tr. 94.

In the area of sustained concentration and persistence, Dr. Demuth opined that Fenstermaker was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 95.  Dr. Demuth further

explained that Fenstermaker's mental health issues would cause reduced concentration and stress tolerance but he remained able to complete 1-4 step tasks.  Tr. 95.

In the area of social interaction, Dr. Demuth opined that Fenstermaker was markedly limited in his ability to interact appropriately with the general public and moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors and get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  Tr. 95.  Dr. Demuth further explained that Fenstermaker could relate on a superficial level to co-workers and supervisors but he was markedly reduced for public interaction and he would work best in small groups or alone.  Tr. 95.

In the area of adaptation, Dr. Demuth opined that Fenstermaker was moderately limited in his ability to respond appropriately to changes in the work setting.  Tr. 95-96.  Dr. Demuth further explained that Fenstermaker's mental health issues would cause reduced ability to respond appropriately to change but he retained the ability to complete 1-4 step tasks.  Tr. 96.

Upon reconsideration, on October 2, 2014, state agency reviewing psychologist Bonnie Katz, Ph.D., completed a PRT (Tr. 105-106) and Mental RFC Assessment (Tr. 109-112).  In the PRT, Dr. Katz reached the same conclusions as Dr. Demuth, i.e., that Fenstermaker had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration.  Tr. 92, 106.  Dr. Katz's Mental RFC Assessment was similar to Dr. Demuth's as far as the rating of various abilities.  Tr. 94-96, 109-112.  They both opined that Fenstermaker had understanding and memory limitations but would be able to perform 1-4 step tasks.  Tr. 94-110.  And they both opined that Fenstermaker had social interaction limitations but could relate on a superficial level to co-workers and

20

supervisors but he was markedly reduced for public interaction and he would work best in small groups or alone.  Tr. 95, 111.  With respect to sustained concentration and persistence limitations, Dr. Katz's explanation differed slightly from Dr. Demuth's.  Dr. Katz explained that Fenstermaker's mental health issue would cause reduced concentration and stress tolerance but he retained the ability to complete 1-4 step tasks in a solitary setting without fast-paced performance demands and he was able to make simple decisions.  Tr. 110.  Also, Dr. Katz's explanation of Fenstermaker's adaptation limitations differed slightly from Dr. Demuth's.  Dr. Katz explained that Fenstermaker's mental health issues would cause reduced ability to respond appropriately to change but he retained the ability to adapt to infrequent changes in routines that are introduced and explained in advance.  Tr. 111.

## C.    Hearing testimony

### 1.    Plaintiff's testimony

Fenstermaker was represented at the hearing and testified regarding his impairments.  Tr. 52, 54-80, 81-82.  When asked what was preventing him from working, Fenstermaker stated "[e]verything from my PTSD, my back, my blood pressure, the nodules on my lungs . . . The PTSD is a big thing because it kind of plays both parts.  It goes from the medical side to the mental health side. . . I have really bad anxiety, the depression, adjustment disorder.  A lot of things just kind of come into play . . ."  Tr. 59.

For his mental health problems, Fenstermaker was attending counseling sessions once or twice a week and seeing a psychiatrist almost every six weeks.  Tr. 59.  He was taking medication prescribed by his mental health providers but he could not recall all the names of the mental health medications that he was taking.  Tr. 59-60.  He did not feel that his medications helped.  Tr. 60.  He indicated that, notwithstanding the medications that he was taking, he

21

continued to have symptoms, including frequent outbursts and anxiety when in public around a lot of people.  Tr. 60.  He explained further that when he is around a lot of people, he starts to sweat and his heart starts to race, which causes him to get dizzy.  Tr. 60.  Fenstermaker reported experiencing the symptoms he described on a daily basis.  Tr. 60.

Fenstermaker has received pain management services for his back.  Tr. 67.  He has also tried physical and water therapy and electric shock treatment.  Tr. 67.  He has not had surgery. Tr. 67.  His arthritis was pressing up against his spinal cord which was causing a lot of numbness.  Tr. 67.  He also has degenerative disc disease at the L2-L3, L4-L5 area.  Tr. 67-68. Fenstermaker had taken pain medication in the past but no longer takes any.  Tr. 70.  He stopped taking the pain medication because he did not want to take it when he had his girls with him because it was getting to the point that he was almost comatose.  Tr. 70.  As a result of the incision from his kidney surgery, Fenstermaker has no feeling on his right side.  Tr. 68. Fenstermaker experiences bouts of dizziness frequently.  Tr. 71-72.  His doctors believe that his dizzy spells are related to his blood pressure.  Tr. 71-72.

Fenstermaker has nodules on his lungs and his doctors recently found a mass on the back of his lung, which they were looking into.  Tr. 68.  Fenstermaker is a smoker and has been diagnosed with COPD.  Tr. 68.  He uses an inhaler at least once a day.  Tr. 69.  Fenstermaker has problems sleeping.  Tr. 69.  He indicated he has onset insomnia.  Tr. 69-70.  He gets about 6 hours of sleep per week.  Tr. 70.  He does not nap but normally does not feel fatigued or tired. Tr. 69-70.  He has tried medication but it has not helped.  Tr. 69-70.

Fenstermaker described a typical day as follows – he wakes up and takes his medications; sits on the front porch for about 15 minutes; and then he lies on the couch, unless he decides to go to lunch.  Tr. 61, 74.  He does a lot less especially without having custody of his daughters

any longer.  Tr. 61.  Fenstermaker explained that he no longer has custody of his daughters for a number of reasons.  Tr. 61.  He was having a number of medical issues and was in and out of the hospital quite a bit so his ex-wife moved closer to them to help with the girls.  Tr. 61.  Also, since his girls were getting older and going through changes in their life, Fenstermaker did not feel particularly suited to deal with those matters and did not think it would be good for him from an anxiety standpoint.  Tr. 61.

When Fenstermaker had custody of his girls, he would do a little cooking and shopping about twice a month.  Tr. 62.  His girls would normally go shopping with him and he tried to make the shopping trips quick and he would try to go when the least amount of people would be there.  Tr. 62.

Fenstermaker lives in a ranch-style home.  Tr. 63. He performs some very light housework.  Tr. 63.  When his girls are there, they will help with dishes and the laundry and, when his girls are not there, housework is not needed as often.  Tr. 63.  Fenstermaker's friend Jerry does yard work for him.  Tr. 63, 78.  Fenstermaker estimated being able to walk about a block before having to stop.  Tr. 70.  He indicated it was difficult for him to walk from his house to the end of the driveway to get his mail without breathing hard, his back hurting, or his legs hurting.  Tr. 70.  Also, with the heat, he has a lot of dizziness.  Tr. 70.  Fenstermaker can be on his feet, either walking or standing, for about 5-10 minutes before having to sit down.  Tr. 70-71. He can sit for about 15-20 minutes before needing to stand up.  Tr. 71.  Fenstermaker would be unable to walk up a flight of stairs without being out of breath.  Tr. 71.  He does not use a cane. Tr. 71.  He estimated being able to comfortably lift less than 10 pounds.  Tr. 71.

Fenstermaker has a driver's license but does not drive.  Tr. 64.  His friend Jerry drives him everywhere.  Tr. 64, 78.  Fenstermaker does not drive because of problems with his back

23

and loss of feeling down the back of his legs.  Tr. 64.  At times Fenstermaker has needed

assistance taking care of his personal needs, e.g., dressing and showering.  Tr.  64.  Fenstermaker

no longer has any hobbies.  Tr. 64.  He used to enjoy archery, riding motorcycles, and going

camping, fishing and hunting but he is no longer engaging in those activities.  Tr. 64-65.

Fenstermaker last went hunting at the end of 2013 or 2014.  Tr. 65.  Fenstermaker does not see

his family and he only has two friends that he actually sees.  Tr. 65.  He sees or talks to his friend

Jerry a daily basis.  Tr. 65, 78-79.  He sees his other friend on a hit or miss basis.  Tr. 65.

Fenstermaker is no longer involved in any organizations or groups.  Tr. 65-66.  Fenstermaker

only leaves the house with one of his girls or his friend, Jerry.  Tr. 79-80.  He usually only leaves

his house for lunch.  Tr. 66.  When he goes to lunch, he frequents a place owned by someone he

knows and that is not crowded when he is there.  Tr. 66.

When working at the sporting goods store, Fenstermaker had problems getting along with

other workers and the public.  Tr. 66.  He explained that "[s]ometimes just the way people react

could kind of set [him] off, whether it be the public, the owner, [or] other employees."  Tr. 66.

### 2.  Vocational expert's testimony

Vocational expert Lynn Kaufmann testified at the hearing.  Tr. 80-85.   The VE classified

Fenstermaker's past work as (1) salesperson, sporting goods, a light, skilled job; (2) archery

equipment repairer, a light, semi-skilled job; (3) deputy sheriff, a medium, skilled job (performed

by Fenstermaker at a slightly less exertional level); (4) body guard, a light, semi-skilled job

(unless the individual was engaging in restraint or pursuit); (5) corrections officer, a medium,

semi-skilled job; (6) Marine Infantryman, a very heavy, semi-skilled job; and (6) sergeant, a

medium, semi-skilled job.  Tr. 82-83.

The ALJ asked the VE to assume an individual who has the RFC to:

> [L]ift or carry up to 50 pounds, occasionally, 25 pounds, frequently, stand or walk six hours in an eight-hour workday, sit up to six hours in an eight-hour workday and full range of all exposure to hazards, including use of moving machinery and unprotected heights.  Work is limited to simple, routine, repetitive tasks, up to 4 Step tasks involved, only occasional changes in the work setting, with any changes explained.  No interaction with the public and only occasional interaction with co-workers.

Tr. 83.

The ALJ then asked the VE whether the described individual could perform any of Fenstermaker's past work.  Tr. 83.  The VE indicated that all past work would be precluded but there would be other jobs that the described individual could perform, including (1) packing jobs with about 12,500 available in Ohio and 400,000 nationally; (2) cleaner positions with about 20,000 available in Ohio and 520,000 nationally; and (3) laundry workers with about 5,000 available in Ohio and 125,000 nationally.  Tr. 83-84.

The ALJ then asked the VE whether there would be work available if the hypothetical was modified as follows:

> [L]imited to lifting and carrying no more than 20 pounds occasionally, 10 pounds, frequently, no climbing of ladder[s], ropes or scaffolds, occasional climbing ramps or stairs, occasional balancing, stooping, crouching, kneeling and crawling, again no hazards, including the use of moving machinery and unprotected heights. Psychological limitations would remain.

Tr. 84.  The VE indicated that the following jobs would be available: (1) light packers, with about 5,000 available in Ohio and 130,000 nationally; (2) sorters, with about 5,000 available in Ohio and 90,000 nationally; and (3) markers, with about 5,000 available in Ohio and 110,000 nationally.  Tr. 84-85.

For her third hypothetical, the ALJ asked the VE if there would be jobs available to an individual limited as follows:

> [L]imited to lifting and carrying no more than five pounds and sitting for a total of two hours in an eight-hour workday, standing maybe up to an hour in an eight-hour workday, and walking maybe up to an hour[.]

Tr. 85.  The VE indicated that there would be no full-time work available for the described individual, noting that the description was less than a sedentary profile.  Tr. 85.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2] . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S.

Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC

and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her October 17, 2016, the ALJ made the following findings:[3]

1.      Fenstermaker last met the insured status requirements on June 30, 2016. Tr. 35.

2.      Fenstermaker did not engage in substantial gainful activity during the period from his alleged onset date of April 1, 2013, through his date last insured of June 30, 2016.  Tr. 35.

3.      Through the date last insured, Fenstermaker had the following severe impairments: degenerative disc disease of the lumbar spine; obesity; and anxiety-related, affective, and personality disorders.  Tr. 35.  Fenstermaker also had the following non-severe impairments: mild obstructive sleep apnea, insomnia, cardiomegaly, hypertension, headaches, questionable chronic obstructive pulmonary disease (COPD), a left fibula fracture, status-post right nephrectomy secondary to cancer, and alcohol abuse, in early remission.  Tr. 36.

---

[3] The ALJ's findings are summarized.

27

4.     Through the date last insured, Fenstermaker did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 36-38.

5.     Through the date last insured, Fenstermaker had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c) except he can lift no more than 50 pounds occasionally and lift and/or carry up to 25 pounds frequently; stand or walk for 6 hours and sit for up to 6 hours in an 8-hour workday; and must avoid all exposure to hazards such as moving machinery and unprotected heights.  Mentally, he can perform work limited to simple, routine, and repetitive tasks, up to 4-step tasks involved; only occasional changes in the work setting with any changes explained; no interaction with the public; and only occasional interaction with co-workers.  Tr. 38-42.

6.     Through the date last insured, Fenstermaker was unable to perform any past relevant work.  Tr. 42.

7.     Fenstermaker was born in 1976 and was 39 years old, defined as a younger individual age 18-49, on the date last insured.  Tr. 42.

8.     Fenstermaker has at least a high school education and is able to communicate in English.  Tr. 42.

9.     Transferability of job skills was not material to the determination of disability.  Tr. 42-43.

10.    Through the date last insured, considering Fenstermaker's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Fenstermaker could have performed, including packer, cleaner, and laundry worker. Tr. 43.

Based on the foregoing, the ALJ determined that Fenstermaker was not under a disability at any time form April 1, 2013, the alleged onset date, through June 30, 2016, the date last insured.  Tr. 44.

## V. Plaintiff's arguments

First, Fenstermaker argues that the ALJ erred because she credited the opinions of the state agency reviewing psychologists but failed to adopt the limitations contained in their opinions that were more restrictive than the limitations contained in the RFC formulated by the

ALJ.  Doc. 17, pp. 6-13, Doc. 19, pp. 1-6.  Second, Fenstermaker argues that the Step Five determination is not supported by substantial evidence because the ALJ relied upon VE testimony that was provided in response to a hypothetical question that did not match the ALJ's RFC.  Doc. 17, pp. 13-16.

## VI. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's

decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.**     **The ALJ properly evaluated the opinions of the state agency reviewing psychologists**

Fenstermaker argues that the ALJ erred because she assigned "great weight" to the opinions of the state agency reviewing psychologists but failed to adopt the limitations contained in their opinions that were more restrictive than the limitations contained in the RFC formulated by the ALJ.  Doc. 17, pp. 6-13, Doc. 19, pp. 1-6.  More particularly, Fenstermaker contends that the ALJ erred by not including in the RFC limitations of only superficial interaction with co-workers or supervisors and no fast-paced performance demands.  Doc. 17, pp. 9-11.

As non-examining reviewing psychologists, Drs. Demuth and Katz did not have an ongoing treatment relationship with Fenstermaker and therefore their opinions were not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).  "Administrative law judges . . . are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions."  *Consideration of Admin. Findings of Fact by State Agency Med. & Psychological Consultants & Other Program Physicians & Psychologists at the Admin. Law Judge & Appeals Council*, SSR 96-6P, 1996 WL 374180 * 2 (S.S.A. July 2, 1996).

It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 404.1527.  *See* 20 C.F.R. § 404.1527(c).  Those factors include (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion

with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend

to support or contradict the opinion.  *Id.*  However, even when the opinion at issue was rendered

by a treating physician, which is not the situation in this case, the ALJ is not obliged to include in

her decision an exhaustive factor-by-factor analysis of the factors.  *See Francis v. Comm'r of*

*Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Here, consistent with the regulations, the ALJ considered the opinions of both Dr.

Demuth and Dr. Katz and explained the weight assigned to those opinions, stating:

> The State agency psychological consultants' mental assessments are given great
> weight because of their program familiarity, longitudinal view of the medical
> evidence of record, and their opinions are consistent with the evidence (Exhibits lA
> and 3A).  The record shows that the claimant's mental health has been stable with
> treatment consisting of counseling and medication as discussed above, which is
> consistent with no more than moderate limitation.

Tr. 41.

While the ALJ's RFC assessment is not identical to the opinions of Drs. Demuth and

Katz, the regulations make clear that a claimant's RFC is an issue reserved to the Commissioner

and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20

C.F.R. §§ 404.1545(a); 404.1546(c).  It is the responsibility of the ALJ, not a physician, to assess

a claimant's RFC.  *See* 20 C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx.

149, 157 (6th Cir.2009) (unpublished).  The ALJ "is not required to recite the medical opinion of

a physician verbatim in his residual functional capacity finding [and] . . . an ALJ does not

improperly assume the role of a medical expert by assessing the medical and nonmedical

evidence before rendering a residual functional capacity finding." *Id.* (internal citations omitted);

*see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) (unpublished)

("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a

claimant's RFC").

Moreover, "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 275 (6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence).  And, an ALJ is not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's opinion.  *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014).

Thus, while the ALJ did not adopt each and every limitation from the opinions of Drs. Demuth and Katz, the ALJ was not required to.  Furthermore, the ALJ did not ignore their opinions nor did the ALJ fail to explain the weight provided to their opinions.  The ALJ adopted portions of Drs. Demuth and Katz's opinions and explained that the evidence was consistent with no more than moderate mental impairment limitations.  Tr. 41.  Having considered the evidence regarding Fenstermaker's mental impairments, the ALJ's RFC limited Fenstermaker as follows:

> Mentally, the claimant can perform work limited to simple, routine, and repetitive tasks, up to four-step tasks involved; only occasional changes in the work setting with any changes explained; no interaction with the public; and only occasional interaction with co-workers.

Tr. 38.  In formulating Fenstermaker's RFC, the ALJ discussed in detail Fenstermaker's treatment history and subjective complaints and considered and weighed the medical evidence. Tr. 35-42.  The ALJ acknowledged Fenstermaker's reported difficulties getting along with others but also noted that he has maintained friendships, he has cared for and regularly spent time with

32

his children, and he has shopped in stores, albeit when they are less busy.  Tr. 37.  The ALJ also considered Fenstermaker's reported problems with concentration, persistence or pace.  Tr. 38, 40.  Although Fenstermaker claimed to have severe mental issues, the ALJ found that his mental impairments remained relatively stable, requiring no inpatient psychiatric hospital admissions; his treatment was relatively conservative; he showed improvement in his symptoms with medication; and he continued to remain active, including participating in archery tournaments.  Tr. 41.  Fenstermaker has not shown that the ALJ failed to consider evidence and it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Here, while Fenstermaker believes that additional limitations should have been included in the RFC, he has failed to show that the RFC is not supported by substantial evidence.  The ALJ found that no more than moderate limitations were warranted and accounted for those limitations that she found were supported by the record.  Additionally, as discussed above, while the ALJ assigned "great weight" to the opinions of Drs. Demuth and Katz, the ALJ was not obligated to adopt their opinions verbatim.

For the reasons discussed herein, the undersigned recommends that the Court find that Fenstermaker has failed to demonstrate reversible error with respect to the ALJ's weighing of the state agency reviewing psychologists' medical opinions.

## C.    Reversal and remand is not warranted based on the ALJ's Step Five determination

Fenstermaker argues that the Step Five determination is not supported by substantial evidence because the ALJ relied upon VE testimony that was provided in response to a hypothetical question that did not match the ALJ's RFC.  Doc. 17, pp. 13-16.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other

work, the question must accurately portray a claimant's physical and mental impairments. Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Fenstermaker takes issue with two discrepancies between the initial VE hypothetical and the RFC.  Doc. 17, pp. 15-16.

First, he argues that the RFC, which states that Fenstermaker can *lift* no more than 50 pounds occasionally and is silent as to the amount of weight Fenstermaker can *carry*, was different than the initial VE hypothetical, "which allowed for both lifting *and* carrying of up to 50 pounds occasionally."  Doc. 17, p. 15 (emphasis supplied).  The undersigned first observes that the initial hypothetical does not allow for both lifting *and* carrying.  The question was posed in the disjunctive – the ALJ asked the VE to "assume a claimant has a [RFC] to lift *or* carry up to 50 pounds, occasionally . . ."  Tr. 83 (emphasis supplied).

Moreover, the RFC describes medium work as defined in 20 C.F.R. § 404.1567(c) with limitations, including a limitation of lifting no more than 50 pounds occasionally.  Tr. 38.  As defined in 20 C.F.R. § 404.1567(c), "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c).  Thus, medium work, as defined in the regulations, does not include a carrying component as it pertains to the 50 pound limitation.  Further, 20 C.F.R. § 404.1567 states that the terms, e.g., sedentary, light, medium, heavy, and very heavy, "have the same meaning as they have in the Dictionary of Occupational Titles ["DOT"][.]"  20 C.F.R. § 404.1567.  In response to the first hypothetical, the VE identified jobs classified under the DOT as medium work.  Tr. 84

(DOT Codes 920.587-018, 1991 WL 687916, (packager, hand); 381.687-018, 1991 WL 673258 (cleaner, industrial); and 361.685-018, 1991 WL 672987 (laundry worker II)).   Considering that medium work as defined in the regulation does not include a carrying component and the VE identified jobs with a DOT designation of medium work, the undersigned concludes that there is no reason to remand this matter for further proceedings based on the fact that the VE hypothetical included "or carry" when referring to the 50 pound limitation.

Second, Fenstermaker argues that the VE hypothetical upon which the ALJ relied allowed for a full range of exposure to hazards, including the use of moving machinery and unprotected heights, but the RFC prohibited exposure to these hazards. Doc. 17, pp. 15-16.  The undersigned finds that this discrepancy is not a reason to remand this matter for further proceedings.  When read in context, the undersigned finds that the first VE hypothetical, which reads ". . . and full range of all exposure to hazards, including use of moving machinery and unprotected heights[,]" (Tr. 83) is likely a transcription error and not a basis for reversal or remand . Tr. 84.  *See e.g.*, *Quaite v. Barnhart*, 312 F.Supp.2d 1195, 1199-1200 (N.D. Ohio 2004) (finding a typographical or clerical error in ALJ decision was not a basis for reversal).  For example, in the second hypothetical, the ALJ stated "again <u>no</u> hazards, including the use of moving machinery and unprotected heights."  Tr. 84.  This statement suggests that, in the first hypothetical, which was the only preceding hypothetical, that the ALJ stated that the environmental limitation was no, not full, exposure to hazards.

Even if not a transcription error, according to the DOT descriptions for the three jobs that the VE identified in response to the first hypothetical question, moving mechanical parts and high exposed places are not present, i.e., they are not activities or conditions that exist for the identified jobs.  *See* DOT Codes 920.587-018, 1991 WL 687916, (packager, hand); 381.687-

35

018, 1991 WL 673258 (cleaner, industrial); and 361.685-018, 1991 WL 672987 (laundry worker II).  Thus, remanding this matter for the purpose of clarifying that the first VE hypothetical included a limitation of no exposure to hazards, including use of moving machinery and unprotected heights, would be futile.  *See e.g., Farrell v. Comm'r of Soc. Sec.*, 2016 WL 316724, * 7 (W.D. Mich. Jan 27, 2016) (finding ALJ's failure to include certain postural limitations that were part of the RFC into the hypothetical to the VE amounted to harmless error and reversal was not warranted because the jobs identified by the VE did not require the postural abilities that the ALJ found the claimant was limited in doing).

Considering the foregoing, the undersigned recommends that the Court find that the ALJ's Step Five finding is supported by substantial evidence and that there is no basis upon which to reverse and remand the Commissioner's decision based on the Step Five finding.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

May 21, 2018

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).